In re GRAHAM SQUARE, INC., Debtor.

GRAHAM SQUARE, INC., Plaintiff,

v.

The MUTUAL LIFE INSURANCE
COMPANY OF NEW YORK,
Defendant.

Bankruptcy No. 90–61182.
Adversary No. 91–6006.

United States Bankruptcy Court,
N.D. Ohio.

Aug. 27, 1998.

Stephen L. Black, Graydon, Head & Ritchey, Cincinnati, OH, for Defendant.

Kenneth L. Gibson, Weick, Gibson & Lowry, Cuyahoga Falls, OH, for Plaintiff.

MEMORANDUM OF DECISION

JAMES H. WILLIAMS, Bankruptcy Judge.

Pending before the Court are the instructions on remand from the United States Court of Appeals for the Sixth Circuit to determine whether a $332,000.00 commitment fee received by The Mutual Life Insurance Company of New York (MONY), pursuant to a mortgage loan application entered into with Graham Square, Inc. (Debtor), is an earned fee entitled to be retained by MONY or whether this fee is recoverable for the Debtor's bankruptcy estate. For the reasons that follow, the Court finds that the commit-

ment fee is an earned fee which MONY is entitled to retain.

## FACTS

A brief synopsis of the procedural and substantive facts follows:

On February 14, 1990, the Debtor applied to MONY for a mortgage loan in the amount of $8,300,000.00 to complete a building project. Union National Bank (UNB) was the principal lender during the construction phase of the project. The loan application was accompanied by a refundable commitment fee in the amount of $332,000.00 in the form of an irrevocable letter of credit issued by UNB in favor of MONY. In order to obtain the issuance of the letter of credit, the Debtor gave UNB a second mortgage and a security agreement to secure the Debtor's obligation to repay to UNB any funds which were drawn by MONY under the letter of credit. The Debtor did not have any equity in the property.

The refundable commitment fee was intended as consideration for expenses which MONY would incur in considering and approving the mortgage loan application, and for MONY holding itself ready and willing to make the loan to the Debtor. The loan application required the Debtor to pay a $117,000.00 nonrefundable commitment fee at closing to induce MONY to close the loan, $16,000.00 for expenses, such as title searches, and a $4,000.00 engineering fee to cover costs in inspecting the property. These fees were in addition to the $332,-000.00 refundable commitment fee. MONY expressly reserved its rights to recover any .damages in connection with the loan application in addition to the fees described above.

On March 12, 1990, MONY restructured the proposed terms of the loan to reduce the amount of the loan to $7,800,000.00 with a higher interest rate. The parties agreed on April 30, 1990, as the termination date to close the loan. The termination date was extended several times. The Debtor, however, was unable to close the loan. Subsequently, MONY drew on the letter of credit receiving $332,000.00 from UNB. The Debtor filed a petition for relief under Chapter 11 of Title 11 of the United States Code on June 6, 1990. The Court granted UNB's motion for relief from stay to foreclose on the Debtor's shopping center. The shopping center was sold to UNB for $8,100,000.00. UNB was owed on its loan with the Debtor the sum of $10,089,855.00. The Debtor filed this adversary proceeding seeking to recover the $332,-000.00 commitment fee paid to MONY. The Debtor's case was later converted to one under Chapter 7 and Michael V. Demczyk was appointed Trustee (Trustee).

This Court made findings of fact and entered conclusions of law in an opinion dated May 11, 1993. In that opinion, the Court found the $332,000.00 refundable commitment fee not to be recoverable by the Trustee under the doctrine of independence and because the fee did not constitute property of the estate as it was paid to MONY via a letter of credit from the property of UNB. The District Court, upon the concurrence of both parties, vacated and remanded for recalculation the damages incurred by MONY when the Debtor failed to close the loan. However, the District Court affirmed the Court's decision that the commitment fee was not property of the Debtor's bankruptcy estate because there was no property for the Trustee to recover. The District Court reasoned that because the mortgage given by the Debtor to finance the letter of credit was worthless, nothing of value had been transferred from the estate and, thus, there was nothing for the Trustee to recover. The Sixth Circuit Court of Appeals reversed, holding that the lower courts erred in finding that the Trustee had no right to recover the $332,000.00 commitment fee because the fee was paid through a standby letter of credit and recovery was precluded by the doctrine of independence. The appellate panel held that the doctrine of independence did not apply to the Trustee's action. The Sixth Circuit further found that the loan agreement commitment fee clause was not an impermissible penalty under Ohio law and the lower courts erred in holding that the proceeds of the letter of credit were not property of the estate. As a result of these findings, the Court of Appeals instructed the lower courts to determine whether the $332,000.00 commitment fee was earned by MONY.

Upon remand, the District Court transferred the case to the Bankruptcy Appellate Panel (BAP) with the consent of both parties. The BAP subsequently remanded the case to this Court for additional findings in light of the Sixth Circuit's opinion.

### DISCUSSION

■ The Court has jurisdiction in this adversary proceeding by virtue of Section 1334(b) of Title 28 of the United States Code and General Order No. 84 entered in this district on July 16, 1984. This is a core proceeding under Section 157(b)(2)(E) of Title 28 of the United States Code. This Memorandum of Decision constitutes the Court's findings of fact and conclusion of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

The contract language from the loan application that is relevant to the resolution of this issue is as follows:

Upon approval of this Application by MONY, the Commitment Fee shall be retained by MONY as its earned fee paid by Applicant in consideration of the expenses which MONY as prospective mortgagee has incurred or will incur in considering and approving this Application, and in further consideration of MONY holding itself ready and willing to make the Loan. MONY agrees to return the Commitment Fee to Applicant, without interest, if, but only if, all conditions of Closing have been satisfied and the Loan has actually closed pursuant to this Application. In the event Applicant fails to comply with any of the covenants and conditions contained in this Application and the Loan is not closed prior to the Termination Date, then MONY shall have the right to retain the Commitment Fee, and, in addition, specifically reserves any and all rights it may have in law or equity, including, but not limited to, specific performance, the right to claim and receive the Processing Fee, the Engineering Fee, and damages for loss of bargain sustained by MONY as a result of such default. Applicant agrees that MONY will be deemed to have earned the Commitment Fee upon MONY's acceptance of this Application.

*See,* Defendant's Exhibit L.

The Trustee argues that this contract language is inconsistent and ambiguous because the commitment fee was never "earned" by MONY's performance but rather by the Debtor's failure to close the loan transaction. The Trustee claims that the commitment fee was never intended to be an earned fee, but rather a deposit to protect MONY from the risk of not being able to collect damages if the Debtor defaulted on its obligations. The Trustee's argument follows that this contract language is intended to be a damage provision which is inconsistent with other language in the loan application that allows MONY to collect damages as well as retain the commitment fee. Thus, the trustee claims that because extrinsic evidence cannot establish the intent of the parties, the contract language must be construed against MONY which drafted the loan application and the commitment fee should be recovered for the Debtor's bankruptcy estate.

The Court, however, declines to adopt the Trustee's position that the contract language is inconsistent or ambiguous in order to invoke rules of construction against MONY which drafted the contract language. First, the Sixth Circuit Court of Appeals did not hold that the relevant contract language is inconsistent. The Sixth Circuit's opinion merely stated that:

MONY also claims that, under the contract, the commitment fee is earned at the moment MONY approves the loan application. In other words, the fee is consideration for MONY's agreement to make the loan and set the funds aside. However, this argument *seems inconsistent* with language in that contract stating that the fee is refundable if the debtor executes the approved loan. It is well settled in Ohio that courts attempt to reconcile inconsistent contract terms and give effect to each term. (Citations omitted).

*Demczyk v. Mutual Life Insurance Company of New York (In re Graham Square, Inc.),* 126 F.3d 823, 830 (6th Cir.1997) (emphasis added). Thus, the Sixth Circuit left to

this Court the opportunity to determine if the commitment fee is an earned fee.

As a matter of Ohio law, contracts "are to be interpreted so as to carry out the intent of the parties." *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974) (syllabus 1) The intent of the parties is to be shown through an interpretation of the contract language. *Kelly v. Medical Life Insurance Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411 (1987) (syllabus 1). Moreover, a court should only consider extrinsic evidence to ascertain the intent of the parties when the terms of the contract are unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with special meaning. *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St.3d 635, 597 N.E.2d 499 (1992).

The Court, however, finds that the relevant contract language is clear in its meaning that if the Debtor failed to close the loan prior to the agreed upon termination date, the commitment fee was to be retained by MONY. There is no ambiguity or inconsistency found in this contract language to invoke the need to consider extrinsic evidence or rules of construction against MONY which drafted this contract. The fact that this commitment fee was refundable if the Debtor closed the loan does not mean that the same fee was also not earned by MONY through its approval of the loan application and obtaining the money to fund the loan. MONY became entitled to the commitment fee when it held itself ready and willing to make the loan. The fact that the commitment fee was refundable if the loan was closed served only as incentive for the Debtor, when it negotiated and signed the loan application, to fulfill its obligations.

This loan application was signed by sophisticated parties on each side of the transaction which negotiated the agreed upon terms on an arms-length basis. If the Debtor objected to the payment of such a commitment fee if the loan did not close, then the Debtor should have negotiated more favorable terms. The Court, however, cannot look beyond the "four corners" of the agreement when the contract language at issue is clear and unambiguous.

The Trustee argues that the commitment fee was merely used as protection against potential losses if the loan did not close. However, that does not take into account that the fee was earned by MONY through its time spent in approving the loan application and its assumption of the risk caused by interest rate fluctuation before the loan was closed. Moreover, the contract language specifically provided that the fee was earned when the loan application was approved and there is no evidence that MONY is seeking to obtain damages in addition to the commitment fee.

It is clear that the purpose of the commitment fee was to reimburse MONY for its expenses in funding the loan and agreeing to lend $7.8 million at a fixed rate of interest over a 45 day time period. Pursuant to the contract language, if the Debtor was able to close the loan, these expenses would have been paid from the nonrefundable commitment fee and the Debtor's loan payments. However, if the loan did not close, then the refundable commitment fee would be retained by MONY to cover these expenses and losses until a replacement borrower was located. The Court of Appeals noted that "[i]t is well settled that courts attempt to reconcile inconsistent terms and give effect to each term." *In re Graham Square, Inc.*, 126 F.3d at 830 (citations omitted). Applying these standards, the Court finds that the commitment fee was earned when MONY invested large amounts of time and expense in approving the loan application and assumed the risk of interest rate fluctuations before the loan closed. At the same time, however, the amount by which the commitment fee would be funded depended upon the Debtor's actions. If the Debtor had fulfilled its obligations, it is clear from the language of the contract that MONY would retain the $117,000.00 nonrefundable commitment fee and receive mortgage payments. However, when the Debtor failed to close the loan, MONY was entitled to retain the $332,000.00 refundable commitment fee as compensation for MONY's expenses and potential losses due to interest rate fluctuations.

MONY "earned" the commitment fee by committing itself to making a fixed interest

rate loan of $7.8 million for a three year period at closing which was intended to take place 45 days after the loan application was signed but was later extended to 72 days. In that time period, MONY assumed the risk that interest rates on three year investments which were used to finance the loan could conceivably rise or fall. If interest rates rose, then MONY could have lost a substantial amount of money because of the higher cost of obtaining money to fund the loan. Thomas Hardy, the assistant vice president of MONY, testified that if the U.S. Treasury rate had increased by 65 basis points, then MONY would not have made any profit on the loan because the rate at which it paid the holders of guaranteed investment contracts to fund the loan would have been the same rate at which MONY agreed to loan the $7.8 million to the Debtor.[1] Thus, MONY earned this fee by assuming the risk that interest rates could fluctuate to a point where it could have incurred a loss by the time the loan closed.

Furthermore, MONY earned the commitment fee by loaning the Debtor $7.8 million at a fixed interest rate and assuming the risk of a change in interest rates between the time it funded the loan and the time it was able to locate another borrower when the Debtor failed to close. As mentioned earlier, MONY funded the loan with the Debtor by selling guaranteed investment contracts at a higher fixed interest rate than that to be paid by the Debtor. When the Debtor failed to close the loan, MONY assumed the risk of paying the holders of these guaranteed investment contracts without any loan payments from the Debtor. MONY essentially was faced with a loss if interest rates had fallen until another borrower was located. In fact, another borrower was not located until 98 days after the Debtor failed to close on its loan with MONY.

It is also clear that MONY earned the commitment fee through its efforts in approving the Debtor's loan application. It is undisputed that MONY incurred 900 hours of professional time and 100 hours of administrative time at a cost of approximately $157,000.00 to investigate and approve a loan of magnitude. *See* Trial Volume 1, Theodore Martens Testimony, at 164–174. The loan application specifically stated that the refundable commitment fee is earned "in consideration of the expenses which MONY as prospective mortgagee *has incurred or will incur* in considering and approving this Application..." The clear language of this loan application signed by the Debtor provides that the commitment fee is earned through the interest rate risk which MONY assumed between the time the loan was funded and another borrower was located.

Various parties testified on MONY's behalf that commitment fees are standard business practice in commercial mortgage applications. *See, e.g.,* James Doyle testimony at 113; Charles Coolidge testimony at 154. There is also no dispute over the enforceability of such a provision. *See, e.g., Enforceability of Provision in Loan Commitment Agreement Authorizing Lender to Charge Standby Fee, Commitment Fee, or Similar Deposit,* 93 A.L.R.3d 1156 at §4 (1980). Furthermore, such fees have found to be earned when the loan commitment agreement has been signed. *In the Matter of Four Seasons Nursing Centers of America, Inc.,* 483 F.2d 599, 603 (10th Cir.1973). In the instant case, there is no question that the loan application specifically provided that MONY earned the commitment fee when the loan application was approved. The Court finds no reason to look beyond the plain language of the agreement. The court concludes that the $332,000.00 commitment fee was earned by MONY through its investigation and approval of the loan application as well as its sold

---

1. MONY funded the loan by selling guaranteed investment contracts in the amount of $8 million with three-year maturities at an interest rate equal to the treasury rate plus 70 basis points. MONY would then sell $6 million of three-year Treasury notes to establish a fixed interest rate and protect its position against interest rate fluctuations. Mr. Hardy testified that the potential loss to be incurred as a result of interest rate

fluctuation for $6 million investment would have been "$260,000.00 plus or minus a few thousand." Hardy Deposition 60, line 19. Performing this same calculation for the full $7.8 million loan made by MONY to the Debtor, the resulting exposure which MONY assumed in funding the loan was $338,000.00 (7.8/6.0 x $260,000.00), approximately the amount of the refundable commitment fee retained by MONY.

guaranteed investment contracts to fund the loan until the time a replacement borrower was located. In light of this decision, the Court agrees with MONY that the issue of the recalculation of its damages suffered when the Debtor failed to close the loan is moot.

An Order in accordance with the foregoing shall issue forthwith.

### ORDER

For the reasons set forth in the accompanying Memorandum of Decision, the Court finds that the $332,000.00 commitment fee negotiated between MONY and Graham Square, Inc. was earned and may be retained by MONY for its efforts in approving the loan application and assuming the interest rate risk in obtaining financing to fund the loan in question. The complaint of the Debtor, Graham Square, Inc., assumed by its trustee in bankruptcy, Michael V. Demczyk, seeking recovery of the commitment fee, should be, and hereby is, DISMISSED.

IT IS SO ORDERED.